Annette W. Jarvis (1649)
Steven T. Waterman (4164)
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone:  801-532-1500
Facsimile:  801-53207543
Email: ajarvis@rqn.com
Email: swaterman@rqn.com

John F. Young (Pro Hac Vice – Docket 1844)
Steven R. Rider (Pro Hac Vice – Docket 2023)
BLOCK MARKUS & WILLIAMS LLC
1700 Lincoln Street, Suite 4000
Denver, Colorado 80203
Telephone: (303) 830-0800
Facsimile: (303) 830-0809
Email: jyoung@bmwllc.com
Email: srider@bmwllc.com

Attorneys for Plaintiffs
James T. Markus, Chapter 11 Trustee

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>GENEVA STEEL LLC,<br><br>GENEVA STEEL HOLDINGS CORPORATION, IRON ORE MINES LLC, and WILLIAMS FARM LLC,<br>    Debtors. | Bankruptcy Case No. 02-21455 GEC<br>(Jointly Administered - Chapter 11)<br><br>Bankruptcy Case No. 02-35385<br>Bankruptcy Case No. 02-35386<br>Bankruptcy Case No. 02-35387 |
| JAMES T. MARKUS, Chapter 11 Trustee of each of GENEVA STEEL LLC, GENEVA STEEL HOLDINGS CORPORATION, IRON ORE MINES LLC, and WILLIAMS FARM LLC,<br>    Plaintiffs,<br>v.<br><br>STEPHEN E. GARCIA, an individual, and KAYE SCHOLER LLP,<br><br>    Defendants. | **Adversary Proceeding No. 06-02309** |

## SECOND AMENDED COMPLAINT

James T. Markus, the duly appointed, qualified, and acting chapter 11 trustee ("Trustee") for each of the bankruptcy estates of Geneva Steel LLC, Geneva Steel Holdings Corporation, Iron Ore Mines LLC, and Williams Farm LLC, plaintiff, for his amended complaint against Stephen E. Garcia, and Kaye Scholer LLP, defendants, states, alleges, and avers, as follows:

**PARTIES**

1.      Plaintiff James T. Markus is the duly appointed chapter 11 trustee ("Trustee") for each of the bankruptcy estates of Geneva Steel LLC, Geneva Steel Holdings Corporation, Iron Ore Mines LLC, and Williams Farm LLC.

2.      Geneva Steel LLC is a Delaware limited liability company with its principal place of business in Utah County, State of Utah.

3.      Geneva Steel Holdings Corporation ("Holdings") is a Delaware corporation with its principal place of business in Utah County, State of Utah.

4.      Iron Ore Mines LLC is a Delaware limited liability company with its principal place of business Utah County, State of Utah.

5.      Williams Farm LLC is a Delaware limited liability company with is principal place of business in Utah County, State of Utah.

6.      Geneva Steel LLC, Iron Ore Mines LLC, Williams Farm LLC and Holdings may be referred to collectively as the "Debtors."

7.      Each of the Debtors is an entity in a voluntary chapter 11 case properly filed and pending in the United States Bankruptcy Court for the District of Utah.

8.      Holdings is the owner of 100% of the membership interests of Geneva Steel LLC, Iron Ore Mines LLC, and Williams Farm LLC.

9.      Geneva Steel Company ("Company"), a Utah corporation, is the prior owner of most assets of the Debtors.

10.     Prior to February 1, 1999, Company was engaged in the business of operating a steel mill in Vineyard, Utah County, State of Utah.

11.     Company operated a fully integrated steel mill considered the largest integrated steel manufacturer in the Western United States.

12.     Company was a publicly held corporation with stock registered on the New York Stock Exchange and was traded in the over the counter market.

13.     Company filed a voluntary petition for relief in this Court pursuant to chapter 11 of title 11 of the United States Code on February 1, 1999.

14.     Pursuant to the terms of the confirmed Third Amended Plan of Reorganization Jointly Proposed by Geneva Steel Company and the Official Committee of Bondholders, as Modified, Dated December 6, 2000, Geneva Steel LLC became the Reorganized Debtor, as defined therein, and succeeded to all right, title, and interest of property of the estate of Company, except to the extent otherwise provided therein.

15.     Pursuant to the terms of the confirmed Third Amended Plan of Reorganization Jointly Proposed by Geneva Steel Company and the Official Committee of Bondholders, as modified, Dated December 6, 2000, new common stock of Holdings was issued and was publicly traded until delisted.

16.     Geneva Steel LLC filed a voluntary petition for relief in this Court pursuant to chapter 11 of title 11 of the United States Code on January 25, 2002.

17.     Holdings filed a voluntary petition for relief in this Court pursuant to chapter 11 of title 11 of the United States Code on September 13, 2002.

18.     Iron Ore Mines LLC filed a voluntary petition for relief in this Court pursuant to chapter 11 of title 11 of the United States Code on September 13, 2002.

19.     Williams Farm LLC filed a voluntary petition for relief in this Court pursuant to chapter 11 of title 11 of the United States Code on September 13, 2002

20.     The Debtors cases are jointly administered pursuant to an order of this Court dated December 16, 2005.

21.     Stephen E. Garcia ("Garcia") is an individual, who is an attorney admitted to practice *pro hac vice* before this Court as counsel for Debtors, an attorney that has represented the Official Committee of Bondholders of the Company, an attorney that has represented the Debtors, an attorney that has appeared before this Court in the Company's and Debtors' cases, and an attorney associated or previously associated with each of the law firms of Kaye Scholer LLP and Hopkins & Sutter nka Foley & Lardner LLP.

        a.     Kaye Scholer LLP fka Kaye, Scholer, Fierman, Hays & Handler, LLP ("KS") is a New York limited liability partnership that has represented the Debtors and appeared before this Court in the Debtors' cases.

### JURISDICTION AND VENUE

22.     This Court has jurisdiction of this matter pursuant to 11 U.S.C. §§ 1334 and 157(a), and DUCivR 83-7.1.

23.     In Exhibit A to his application for pro hac vice admission, Garcia and KS consented to the jurisdiction of this Court for the misconduct alleged herein.

4

24.     This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

25.     This adversary proceeding involves issues concerning administration of the estate
and property of the estate pursuant to 11 U.S.C. § 541, recovery of professional fees paid and
damages based upon disloyalty, conflicts of interest, false representations of Garcia, and legal
malpractice.

26.     At all times pertinent hereto, Garcia and KS engaged in business and transactions
with the Debtors as legal counsel, and were often physically present within the State of Utah in
connection therewith, including in appearances before this Court.

27.     Venue is proper herein in accordance with 28 U.S.C. § 1409.

### Related Individuals and Entities

28.     Kenneth C. Johnsen aka Ken C. Johnsen ("Johnsen") was an officer and/or
director of Company and Debtors.

29.     Joseph A. Cannon ("Cannon") was an officer and director of Company and
Holdings.

30.     Frank MacInnis ("MacInnis") was a director of Holdings.

31.     Murray Drabkin ("Drabkin") was a director of Holdings.  Additionally, Drabkin is
an attorney and was previously associated with Garcia.

32.     Albert Fried, Jr. ("Fried") was a director of Holdings and a co-chair of the Official
Committee of Bondholders ("Bondholders Committee") in Company's case.

33.     Albert Fried & Company ("AFCO") was a bondholder of Company and secured
lender of Geneva Steel LLC.

34.     At all times relevant hereto, AFCO, The Fried Group, LLC, Steelman, Inc., and Steelman Realty LLC were affiliates of Fried.

### Summary of Claims

35.     Garcia (at that time, of Hopkins & Sutter) was counsel for the Bondholders Committee in Company's bankruptcy case, with Fried, on behalf of AFCO, as co-chair of that committee.

        a.      On information and belief, KS commenced representation of the Bondholders Committee on or about January 15, 2001.

36.     Garcia represented that he and Hopkins & Sutter were disinterested within the meaning of bankruptcy law.

37.     At the commencement of Company's bankruptcy case, Garcia and Hopkins & Sutter were representing a Committee in the Raytech case, (of which Committee AFCO or Fried was a member) which representation was not disclosed to this Bankruptcy Court.

38.     At the commencement of Company's bankruptcy case, Garcia and Hopkins & Sutter were representing a Committee in the Reliance Acceptance Group chapter 11 case.

39.     AFCO made a bridge loan to Company shortly before the effective date of its plan of reorganization, the documentation for which was reviewed by Garcia on behalf of AFCO but paid for by the Reorganized Debtor.

40.     Garcia and KS were counsel for the Reorganized Debtor and its affiliates post confirmation, commencing on January 15, 2001.

41.     Garcia maintained a personal brokerage account with AFCO through which securities were traded, which was not disclosed to the Bankruptcy Court in the Debtors' cases.

42.     Garcia and KS were counsel for the Debtors in their chapter 11 cases filed in 2002.

43.     Garcia and KS falsely represented in the Debtors' cases that they were disinterested within the meaning of bankruptcy law.

44.     Garcia and KS failed to disclose to the Bankruptcy Court in the Debtors' cases (a) Garcia's representation of the committee on which AFCO or Fried participated in the Raytech bankruptcy case, and (b) Garcia's representation of AFCO in connection with the bridge loan documentation.

45.     Garcia and KS failed to disclose to this Bankruptcy Court Garcia's personal investment brokerage account with AFCO, the largest shareholder of Holdings and one of the secured lenders of Geneva Steel LLC.

46.     During Debtors' chapter 11 cases, Garcia and KS represented the interests of Steelman, Inc. an affiliate of AFCO and Fried, without disclosure to this Bankruptcy Court.

47.     During Debtors' chapter 11 cases, Garcia and KS represented the interests of AFCO in connection with:

(a) a loan to Dermott Clancy;

(b) the Raytech bankruptcy case;

(c) the Fleming bankruptcy case;

(d) a loan to Basin Water; and

(e) allocation of interest payments on the secured loan of Debtors;

none of which were ever disclosed to the Bankruptcy Court.

48.     Garcia received benefits in his AFCO brokerage account when key events beneficial to AFCO occurred in the Debtors' chapter 11 cases.

7

49.    Garcia and KS presented to the Debtors' directors, officers, and management the position of AFCO in order to reduce the strike price of the option on the Williams Farm.

50.    Garcia and KS failed to disclose to the Debtors' directors, managers, officers and management their failure to timely perform securities work as requested by the Debtors.

51.    Garcia and/or KS provided the Debtors' confidential information to Fried and/or AFCO in violation of their duty of loyalty owed to the Debtors.

52.    Garcia and KS failed to disclose to the Bankruptcy Court, until March 2005, Garcia's personal investment with Johnsen, an officer and director of the debtors in possession, Cannon, a director of the debtors in possession, MacInnis, a director of the debtors in possession, and Fried or his affiliates, a former director of the debtors in possession, the largest equity holder of the debtors in possession and one of the secured lenders of the debtors in possession.

a.    Within days of filing the March 2005 supplemental disclosure, Garcia liquidated his brokerage account with AFCO but never disclosed its existence to this Bankruptcy Court.

53.    Garcia and KS failed to disclose and account to the Bankruptcy Court for the receipt of $893,784.18 from the Reorganized Debtor during the preference period, and the effect of those payments on its disinterestedness.

**Garcia Legal Representation of Company in Bankruptcy**

54.    After Company filed its voluntary petition for relief on February 1, 1999, the United States Trustee, pursuant to 11 U.S.C. § 1102(a)(1), appointed the Official Committee of Bondholders ("Bondholders Committee") in the Company's bankruptcy case on February 23,

8

1999, with Simplon Investment Limited and Simplon Partners, L.P., AFCO, Loomis Sayles & Co., LLP, and Bankers Trust Company as members of that committee.

55.     At its organizational meeting on February 22, 1999, the Bondholders Committee selected Garcia and his law firm (Hopkins & Sutter) as its counsel, specifically including two of its attorneys, Drabkin and Garcia.

56.     On March 9, 1999, the Bondholders Committee, by its Co-Chairman Fried, filed its application (dated February 22, 1999) to employ Garcia and Hopkins & Sutter as counsel in the chapter 11 of Company.

57.     The Bondholders Committee application to employ Garcia and Hopkins & Sutter, filed March 9, 1999, was supported by the sworn declaration of Garcia, individually and as a partner of Hopkins & Sutter, dated March 8, 1999.

58.     The declaration of Garcia disclosed that prior to the filing of the Company's petition for relief, commencing on or about January 13, 1999, Garcia and Hopkins & Sutter had "represented AFCO and Loomis Sayles & Co., Inc. … in connection with the out-of-court restructuring efforts of the Debtor" and in connection therewith had been paid fees by the Debtor in connection with that work.

59.     The declaration of Garcia did not disclose that Garcia and Hopkins & Sutter were performing or had performed legal services for AFCO or Fried in other matters.

60.     On March 26, 1999, the United States Trustee reconstituted the Bondholders Committee by adding Dr. E. Capers Palmer, Harold G. Smith, and Gilbert Devore as additional members.

61.     By order entered April 15, 1999, this Court approved the employment of Garcia and Hopkins & Sutter as counsel for the Bondholders Committee finding satisfaction of the disinterested test based upon the declaration and statements of Garcia.

62.     During the pendency of the Company's chapter 11 case, from February 1, 1999, through January 31, 2001, Garcia and his law firm were awarded and paid fees (exclusive of expense reimbursements) in the total sum of $ 982,666.66.

63.     The Bondholders Committee application to employ Garcia and his law firm, filed March 9, 1999,  was supported by the sworn declaration of Garcia, individually and as a partner of Hopkins & Sutter, dated March 8, 1999, declaring that the law firm does not have "any connection with the Debtor, its creditors or any other party in interest … except as set forth in this Declaration" and that **"I do not know of any representation by [my law firm] of any of the Debtor's known creditors"** (emphasis added) and "in the event that I become aware that [the law firm] represents any other creditors of the Debtor, [the law firm] will promptly notify the Court and parties in interest of such representation by filing with the Court and parties in interest of such representation by filing with the Court an amended Declaration."

(a)  Only one supplemental declaration was filed by Garcia and Hopkins & Sutter, that being the First Supplemental Declaration of Stephen E. Garcia, dated January 6, 2000, but which declaration only modified the hourly rates and did not disclose any further information.

64.     Company confirmed a plan of reorganization with an effective date of January 3, 2001, which plan created the Debtors.

**KS and Garcia Legal Representation of Debtors Prior to Bankruptcy Filings**

65.     On or about January 15, 2001, Garcia changed law firms and became a partner of KS.

66.     In conjunction with Garcia's change of law firms, Garcia and KS commenced performing professional legal services for each of the Debtors as well as the Bondholders Committee.

67.     Garcia and KS had an attorney client relationship with Debtors from January 15, 2001, through the date of the filings of their petitions for relief under chapter 11 of title 11 of the United States Code, and until appointment of the Trustee on April 18, 2005.

68.     During the period of time between January 15, 2001, and January 25, 2002, Garcia and KS received payment of fees and costs of approximately $207,488.68 related to the restructuring of the Debtors and total legal fees and costs of approximately $1,253,901.12.

**KS and Garcia Representation of Debtors in Possession**

69.     On January 25, 2002, Geneva Steel LLC filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code.

70.     On January 25, 2002, Geneva Steel LLC, by Johnsen, its CEO and President, filed its application to employ Garcia and KS as counsel in its chapter 11.

71.     The application to employ Garcia and KS was supported by the sworn declaration of Garcia, individually and as a partner of KS, dated January 25, 2002.

72.     The declaration of Garcia disclosed that prior to the filing of Geneva Steel LLC's petition for relief, Garcia and Hopkins & Sutter served as counsel to the Bondholder's

11

Committee in the Company's chapter 11 case but did not disclose that KS represented the Bondholder's Committee through at least October 26, 2001.

73.    Garcia in his declaration disclosed various other legal interests of Garcia and KS but opined that those other matters have "no effect upon or influence of [Geneva Steel LLC's] chapter 11 case."

74.    Garcia and KS provided no disclosure of their concurrent representation of AFCO in other matters.

75.    Garcia and KS stated that  they "[do] not represent, ha[ve] not represented and will not represent any of these parties in any matter even remotely related to the Debtor or its chapter 11 case."

76.    In the declaration, for himself and KS, Garcia promised this Bankruptcy Court that "[f]urther inquiry will be made following the submission of this affidavit and to the extent that [the law firm] identifies any other parties in interest which [his law firm] represented or, currently represents, [the law firm] shall disclose such information as it becomes known."

77.    By order entered March 3, 2002, this Court approved the employment of Garcia and KS as counsel for Geneva Steel LLC finding satisfaction of the disinterested test based upon the declaration and statements of Garcia.

78.    During the pendency of the Geneva Steel LLC's chapter 11 case, from January 25, 2002, through January 28, 2005, Garcia and KS were paid fees and expense reimbursements in the total sum of $ 2,665,581.68.

79.    In addition to the fees paid to Garcia and KS, additional fees and expense reimbursements were either requested or incurred for the time period of September 1, 2004,

through April 18, 2005, for which payment has not been made in an additional total sum of $784,269.63.

80.    The sworn declaration of Garcia, individually and as a partner of KS, dated January 24, 2002, declared that Garcia and no other partner, associate or paraprofessional of [the law firm] "holds or represents any interest adverse to the Debtor or its estate …" and that the law firm is disinterested within the definition of the Bankruptcy Code.

81.    Only one supplemental declaration was filed by Garcia and KS, that being the First Supplemental Affidavit of Stephen E. Garcia, dated March 7, 2005, which declaration set forth the personal investment of Garcia with Fried, Johnsen, Cannon, MacInnis and others in connection with Utah County real estate, but further opined that Garcia, KS, and no other "partner, associate or paraprofessional of [the law firm] … holds or represents any interest adverse to the Debtor or its estate in the matters upon which it is employed" and that KS remains disinterested as defined by the Bankruptcy Code.

82.    Garcia further stated that his direct or indirect relationship to Fried "is not an interest that is materially adverse to the interest of the estate or of any class of creditors or equity security holders."

83.    Garcia and KS provided no disclosure of their concurrent representation of AFCO or Fried in other matters, nor any disclosure of Garcia's brokerage account with AFCO.

**Williams Farm Property Description**

84.    On or around April 27, 1966, United States Steel Corporation acquired certain real property located and situated in Utah County, State of Utah from various members of the Williams family ("Williams Farm Property"), which real property is legally described as follows:

13

> Beginning at the Southeast Corner of Section 5, Township 6 South, Range 2 East, Salt Lake Base and Meridian; thence North 16.5 feet along the Section line to a fence line; thence North 89 degrees 53' West along a fence line on the North boundary of 1200 North Street, Orem, Utah 465.76 feet; thence North 06 degrees 52' West along a fence line on the East boundary of State Highway No. 114, Orem, Utah, 1469.36 feet; thence South 89 degrees 35' East along a fence line 636.80 feet, thence South 0 degrees 11' East along fence line 151.62 feet more or less; thence East 1740 feet more or less to the highway right-of-way West line; thence Southerly along said right-of-way 1400 feet more or less to the Section line; thence Westerly along the Section line 2100 feet more or less to the point of beginning.

85.     The Williams Farm Property is located across Geneva Road from the main Geneva Steel mill site and is located within the city limits of Orem, Utah.

86.     On or about August 31, 1987, USX Corporation, a successor in interest to United States Steel Corporation, transferred the Williams Farm Property to Basic Manufacturing and Technologies of Utah, Inc.

87.     Record title to the Williams Farm Property remained in Basic Manufacturing and Technologies of Utah, Inc. until 2001.

88.     Basic Manufacturing and Technologies of Utah, Inc. changed its name on January 17, 1990 to Geneva Steel.

89.     On February 17, 1993, Geneva Steel changed its corporate name to Geneva Steel Company.

90.     Legal title to the Williams Farm Property passed to Company as a matter of law upon the change of its corporate name.

91.     The Williams Farm Property was used in the steel mill operations from its acquisition in 1987 until approximately November 15, 2001, to provide sand for use in the steel making operations at the steel mill plant site.

14

### Garcia's Legal Work for AFCO Prior to Company's Bankruptcy

92.     During the period of approximately eighteen months before February 1, 1999, AFCO, or its predecessor, was engaged in transactions involving the purchase of Company's 11.125% Senior Notes and 9.5% Senior Notes (hereafter the "Notes").

93.     AFCO, or its predecessor, purportedly acquired approximately $60 million of the Notes in the open market before Company filed its bankruptcy petition in February 1999.

94.     During the fall of 1998 and January of 1999, principals of AFCO served on an informal group of bondholders of Company, which group was represented by Hopkins & Sutter, and in particular, Garcia.

95.     Garcia was personally present during numerous meetings of those bondholders and the management and professionals representing Company during the attempted workout of the bondholders' claims against Company.

96.     During these meetings, Garcia and Fried became aware of inside information pertaining to the financial condition of Company.

97.     In 1999, in connection with the Company's motion to sell the Williams Farm Property, the Company provided to the Bondholders Committee, specifically Fried and Garcia, an appraisal of the Williams Farm Property.

98.     Although the potential sale of the Williams Farm Property was not consummated, Garcia and Fried acquired knowledge that the Williams Farm was a non essential operating asset that possessed significant value.

99.     Garcia participated in drafts and comments on formulating a plan of reorganization that included the concept of dividing Company to separate the non essential assets into separate entities.

100.    Garcia and Fried, became aware that certain assets of Company were considered nonessential to the operation of the steel mill and the valuation of those assets by the management of Company and its independent professionals.

101.    The nonessential assets included the Williams Farm Property and the iron ore mines located in southern Utah and later owned by Iron Ore Mines LLC.

102.    The information about the Company, learned by Garcia and Fried was not public information.

103.    In January 1999, an informal group of the bondholders met with representatives of Company to attempt to work out an extension on the payments due bondholders and preferred shareholders of Company.

104.    Garcia and Hopkins & Sutter represented some of the bondholders at this time, including the interests of AFCO.

105.    Because negotiations with bondholders were unsuccessful, Company filed a voluntary chapter 11 bankruptcy petition on February 1, 1999.

106.    At all times pertinent hereto, Garcia and Hopkins & Sutter represented Fried, individually, AFCO, and from time to time their affiliates, on matters both related and unrelated to Company.

107.     Garcia and Hopkins & Sutter also represented the interests Loomis Sayles & Co. in its interests as a bondholder of Company on and before the application of Hopkins & Sutter to represent the Bondholders Committee was approved.

108.     Fried, and an officer of Loomis Sayles & Co., Fred Vyn, became co-chairmen of the Official Bondholders Committee of Geneva Steel Company.

109.     Upon information and belief, at all times pertinent hereto, Garcia represented the interests of Fried and AFCO and thus any advice given by Garcia and KS to the Debtors involving any transaction between the Debtors and Fried or AFCO was tainted by the conflict of interest of legal counsel.

## Garcia Representation of AFCO in Raytech Case

110.     Garcia and Hopkins & Sutter initially and KS later represented a committee, of which AFCO or Fried was a member, in the Raytech bankruptcy case commencing in 1989 and ongoing at the time of Company's chapter 11 filing and the chapter 11 filing of Geneva Steel LLC.

111.     At no time during Company's bankruptcy case did Garcia or Hopkins & Sutter disclose its representation of the AFCO or Fried affiliated committee in the Raytech bankruptcy case.

112.     On January 15, 2001, Garcia and KS took over the representation of the AFCO or Fried affiliated committee in the Raytech bankruptcy case.

113.     At no time during Geneva Steel LLC's bankruptcy case or any of the Debtors' cases did Garcia or KS disclose their representation of the AFCO or Fried affiliated committee in the Raytech bankruptcy case.

17

114.    Garcia knowingly and intentionally failed to disclose to this Court his concurrent representation of the committee, of which AFCO or Fried was a member, in the Raytech chapter 11 case.

115.    [Intentionally left blank.]

116.    KS prohibited its partners and attorneys from purchasing or owning notes of Reliance Acceptance Group.

117.    Garcia held notes of Reliance Acceptance Group in his personal AFCO brokerage account.

118.    Upon information and belief, the Reliance Acceptance Group notes were purchased by Garcia from AFCO based on inside or confidential information.

119.    [Intentionally left blank.]

120.    [Intentionally left blank.]

121.    Garcia and KS had an affirmative duty to disclose all connections with AFCO and Fried to the Bankruptcy Court.

122.    [Intentionally left blank.]

123.    Upon information and belief, at all times pertinent hereto, Garcia and KS represented the interests of Fried and AFCO and thus any advice given by Garcia and KS to the Debtors involving any transaction between the Debtors and Fried or AFCO was tainted by the conflict of interest of legal counsel.

**Garcia's Legal Work on Bridge Loan Made by AFCO**

124.    On or around December 13, 2000, AFCO made a $3.5 million bridge loan to Company to provide time to implement the Third Plan, the commitment letter and term sheet for which were drafted by Garcia for the benefit of AFCO.

125.    Garcia and Hopkins & Sutter billed the fees and costs in connection with the bridge loan to the Company through the Bondholders Committee.

126.    After the effective date of the Company's Plan of Reorganization, Garcia and KS on behalf of the Reorganized Debtor reviewed and approved the fees and costs of the Bondholders Committee and did not file an objection thereto, but filed objections to every other party's fee application.

127.    This Court approved the bridge loan on or around December 15, 2000.

128.    The terms of the bridge loan did not contain the grant of an option to AFCO on the Williams Farm Property.

129.    Upon information and belief, at all times pertinent hereto, Garcia and Hopkins & Sutter represented the interests of Fried and AFCO and thus any advice given by Garcia to the Debtors involving any transaction between the Debtors and Fried or AFCO was tainted by the conflict of interest of legal counsel.

**History, Confirmation and Terms of Company's Plan of Reorganization**

130.    During January 2000, representatives of the Bondholders Committee, including Fried of AFCO and Fred Vyn of Loomis Sayles & Co., negotiated with Company on a proposed plan of reorganization.

131.    The Bondholders Committee represented to Company that the bondholders would agree to exchange their loan claims for an equity interest in a reorganized Company as a part of a chapter 11 plan of reorganization, if the Company could obtain working capital in excess of the amount necessary to pay off its debtor in possession financing.

132.    On or around January 31, 2000, Company filed an application with the Emergency Steel Loan Guarantee Board ("Board") for a government guaranteed loan sufficient to meet the requirements of the Bondholders Committee.

133.    On or around January 31, 2000, Citicorp, USA became the lead lender on the loan application filed by Company with the Board.

134.    Based on this proposed plan, AFCO would obtain the largest equity interest in the reorganized Company and Loomis Sayles & Co. would obtain the second largest equity interest in the reorganized Company.

135.    On or around March 22, 2000, AFCO entered into a Standby Commitment to Exercise Equity Rights for Convertible Preferred Stock to be Issued Pursuant to Chapter 11 Plan of Reorganization (the "Commitment").

136.    Pursuant to the terms of the Commitment, AFCO committed to purchase, on a standby basis, $10 million of the reorganized Company preferred stock to be issued as part of the proposed plan of reorganization.

137.    After March 22, 2000, the Bondholders Committee and Company prepared a draft of the plan of reorganization that was jointly proposed by the Company and the Bondholders Committee.

138.    Fried attended several meetings between negotiators for the Company and the
Bondholders Committee and reiterated his strong support for the proposed plan, including the
Commitment and the support of the Bondholders Committee for the draft plan.

139.    In reliance on the support of the Bondholders Committee and Fried, Company did
not pursue any alternative plans, including a prior business plan involving the offering of equity
interests to the general public in the reorganized Company.

140.    On or around July 20, 2000, a proposed plan of reorganization of Company was
jointly filed by Company and the Bondholders Committee.

141.    The proposed plan incorporated the Commitment of AFCO to purchase, on a
standby basis, $10 million of reorganized Company preferred stock to be issued under the
proposed plan of reorganization.

142.    The proposed plan also envisioned exit financing in the nature of a term loan of
$110 million, with "interest at approximately LIBOR plus 1.8% (blended)," in three tranches:
Tranche A, Tranche B, and Tranche C (the "Term Loan"), with Tranches A and B partially
guaranteed by the Board, but the Board would not guarantee Tranche C.

143.    The Tranche C loan terms did not provide as a condition of the loan any grant or
transfer of the Williams Farm Property to the lender of the Tranche C loan.

144.    The disclosure statement filed in conjunction with the proposed plan, described
the foregoing provisions of the initial plan.

145.    At no time and in no disclosure statement or amendments or corrections thereto
did the Bondholders Committee or Company ever disclose to this Court in any paper or pleading

21

a grant of any interest, including but not limited to an option to purchase the Williams Farm

Property to the Tranche C lender.

## Garcia's Brokerage Account with AFCO

146.    Since at least February 2001, Garcia held and maintained a brokerage account

with AFCO.

147.    At no time during the Debtors' bankruptcy cases did Garcia or KS ever disclose to

this Court or the creditors the existence of Garcia's brokerage account at AFCO.

148.    The AFCO brokerage account was in existence at the time Garcia and KS filed

their application for retention in the chapter 11 case of Geneva Steel LLC.

149.    AFCO was a secured lender of Geneva Steel LLC.

150.    At various times from February 2001 to the present, the Garcia brokerage account

held stock in Palatin Technologies.

151.    Commencing no later than April 2002, Fried was a financial consultant to Palatin

Technologies and upon information and belief possessed inside information pertaining to Palatin

Technologies.

152.    Upon information and belief, AFCO sold Garcia share of Palatin Technologies at

below published market prices.

153.    The Garcia brokerage account at AFCO was a connection that was required to

have been disclosed to this Court.

154.    The Garcia brokerage account was adverse to Garcia's and KS's representation of

the Debtors.

155.    Garcia commenced closing his brokerage account with AFCO concurrent with the filing of his First Supplemental Affidavit of Stephen E. Garcia, dated March 7, 2005.

156.    Garcia and KS failed to disclose the existence of the AFCO brokerage account in Garcia's original declaration and in his First Supplemental Affidavit of Stephen E. Garcia, dated March 7, 2005.

157.    Garcia knowingly and intentionally failed to disclose to this Court his brokerage account with AFCO.

158.    Upon information and belief, at all times pertinent hereto, Garcia and KS represented the interests of Fried and AFCO and thus any advice given by Garcia and KS to the Debtors involving any transaction between the Debtors and Fried or AFCO was tainted by the conflict of interest of legal counsel.

**Garcia and KS Representation of Steelman**

159.    Steelman, Inc. was either a wholly owned subsidiary of AFCO or its affiliate at all relevant times.

160.    Garcia and KS had an attorney client relationship with Steelman, which was required to be disclosed to this Court.

161.    Garcia and KS performed legal services for Steelman, including but not limited drafting and filing Steelman's incorporation documents and preparing consulting agreements for Johnsen, Cannon, and David Gardner.

162.    Garcia knowingly and intentionally failed to disclose to this Court the work performed by Garcia and KS for Steelman, an affiliate of AFCO and Fried.

163.    Upon information and belief, at all times pertinent hereto, Garcia and KS represented the interests of Fried, AFCO, and affiliates, including Steelman, and thus any advice given by Garcia and KS to the Debtors involving any transaction between the Debtors and Fried, AFCO, or their affiliates was tainted by the conflict of interest of legal counsel.

**KS and Garcia Representation of AFCO During Debtors' Bankruptcies**

164.    During the pendency of the Geneva Steel LLC chapter 11 case, Garcia and KS represented the interests of AFCO in matters undisclosed to this Court.

165.    Garcia and KS had an attorney client relationship with AFCO, which was required to be disclosed to this Court.

166.    Garcia and KS performed legal services for AFCO, including but not limited to:

a.    preparation of loan documents for loans made by AFCO to Basin Water and Dermott Clancy;

b.    an opinion with respect to the division of loan proceeds among the various secured lenders in a manner to provide a greater return to AFCO; and

c.    representation in connection with the chapter 11 case of Fleming Companies.

167.    Garcia knowingly and intentionally failed to disclose to this Court the work performed by Garcia and KS for AFCO.

168.    Upon information and belief, at all times pertinent hereto, Garcia and KS represented the interests of Fried and AFCO and thus any advice given by Garcia to the Debtors involving any transaction between the Debtors and Fried or AFCO was tainted by the conflict of interest of legal counsel.

24

## Development of Company's Eventually Confirmed Plan and Its
## Treatment of Williams Farm

169.    Consistent with the initial plan described above, the disclosure statement accompanying the plan stated that the Williams Farm Property would be transferred from Company to Williams Farm LLC free and clear of liens and encumbrances.

170.    Sometime in late August or early September 2000, Citigroup indicated to Company and the Bondholders Committee that it could not locate a lender willing to commit to make the Tranche C portion of the Term Loan.

171.    On or around September 28, 2000, Johnsen on behalf of Company offered to release AFCO from its Commitment to purchase $10 million of the preferred stock offering in exchange for the agreement of AFCO to make the Tranche C portion of the Term Loan.

172.     On or around November 20, 2000, Company and AFCO entered into a commitment letter whereby AFCO agreed to fund approximately $9.8 million of the Tranche C portion of the Term Loan.

173.    Pursuant to this commitment, AFCO committed to fund the Tranche C portion of the Term Loan on the condition that the Company's plan of reorganization be approved by the Bankruptcy Court.

174.    The commitment letter did not require that the reorganized Company provide an option on the Williams Farm Property in consideration of making the Tranche C portion of the Term Loan.

175.    The terms of this commitment letter were disseminated to various creditors of Company.

176.    On or around November 21, 2000, Company and the Bondholders Committee jointly filed a Third Amended Plan of Reorganization with this Court ("Third Plan").

177.    Garcia on behalf of AFCO for the Bondholders Committee signed the Third Plan.

178.    The Third Plan did not provide that AFCO would receive an option on the Williams Farm Property in consideration of making the Tranche C portion of the Term Loan.

179.    Fried signed the disclosure statement accompanying the Third Plan, which made no indication that the Williams Farm Property would be used or offered as collateral or fees for any portion of the Term Loan.

180.    The Third Plan provided that the Williams Farm Property would be transferred to Williams Farm LLC free of the claims of all creditors, which would encompass AFCO.

181.    The Third Plan and disclosure statement were disseminated to the creditors of Company, and a pertinent provision states as follows:

> 2. <u>Restructuring of Geneva</u>. On or before the effective date, a successor to Geneva will merge with and into a Delaware limited liability company (the "<u>Reorganized Debtor</u>"). The Reorganized Debtor will own substantially all of Geneva's operating assets, and will be wholly owned by the Holding Company. The Old Preferred Stock and the Old Common Stock shall be cancelled. Similarly, the Plan also contemplates that Geneva's current property known as the Williams Farm and Geneva's iron ore mines will be owned by separate wholly-owned subsidiaries of the Holding Company. The Holding Company will also own Vineyard Management Company, Vineyard Iron Company, and, through these entities, their interests in CPICOR Management Company, LLC. See Section III G 2, entitled: "Cokeless Iron making Project."

182.    The Disclosure Statement describes the implementation of the Third Plan as dependent on the Term Loan of $110 million to be issued as a part of the Exit Financing.

183.    At page 80 of the Disclosure Statement, the following appears:

> In addition to the conversion of its unsecured debt into common equity, Geneva will secure exit financing through (i) a $110 million New Term Loan. . . and (iii) $25.0 million of New Preferred Stock. The U.S. Government will guarantee 85% of the New Term Loan under the Steel Loan Act. The New Term Loan will be further secured by substantially all of Geneva's operating assets (excluding inventory, accounts receivable, interests in Geneva's existing subsidiaries, the Williams Farm Property…The New Term Loan matures in September 2005 and bears interest at approximately LIBOR plus 1.8% (blended).

184.   On or around November 28, 2000, and in contemplation of the confirmation of the Third Plan, Williams Farm LLC was formed in the State of Delaware with Johnsen, Cannon and Dennis Wanlass appointed as managers of Williams Farm LLC.

185.   A limited liability company agreement was executed for Williams Farm LLC and provided that the managers of the company shall not undertake any action without the approval of the members including "the reorganization, consolidation, merger or sale of all, substantially all or a material amount of the assets of the Company."

186.   On or about December 8, 2000, the United States Bankruptcy Court for the District of Utah entered an order in the Company's chapter 11 bankruptcy case confirming the Third Plan, with minor amendments.

187.   As a part of the Third Plan, Fried was appointed a director of Holdings, the holding company of the Reorganized Debtor.

188.   Neither the Third Plan nor the Order confirming the Third Plan contained any provision relating to the grant of any option on the Williams Farm Property to AFCO or any other entity or person.

189.    The Third Plan provided for the division of the assets of the Company into separate entities with exit financing provided by a syndicate of lenders, including a federally guaranteed loan for 85% of the Term Loan portion of the exit financing.

190.    As a part of the Third Plan, Company was restructured whereby Geneva Steel LLC (also defined as the "Reorganized Debtor") became an operating company to operate the Geneva Steel mill as a wholly owned subsidiary of Holdings.

191.    The Third Plan also established several other subsidiaries of Holdings, including the prior subsidiaries of Company.

192.    The exit financing of Company provided for in the Third Plan included a loan facility consisting of a $110 million term loan and an operating loan ("Exit Credit Facility").

193.    Section 6.07 of the Third Plan states that the "Term Loan shall be in the amount of $110,000,000 and shall have the [sic] substantially the terms set forth in the loan and security agreement and related documents which will be filed with the Court at or before the hearing on confirmation of the Plan."

194.    The Exit Financing documents submitted to the Bankruptcy Court did not contain the Trance C loan terms and fees as executed between the Company and AFCO.

195.    The Exit Financing documents submitted to the Bankruptcy Court did not contain the grant of an option on the Williams Farm Property to AFCO.

196.    The other subsidiaries of Holdings established as a part of the reorganization of Company were Iron Ore Mines LLC, with certain iron ore mines owned by Company transferred clear of liens and encumbrances to Iron Ore Mines LLC, and Williams Farm LLC, with the Williams Farm Property transferred clear of liens and encumbrances to Williams Farm LLC.

28

197.    The Third Plan provides, as follows:

(f)  In the event that the total number of Equity Rights sought to be exercised pursuant to Primary Exercises and Oversubscription Exercises is less than the number of Equity Rights under the Plan, the Stand-By Purchasers shall exercise all remaining Equity Rights pursuant to the terms and conditions of the Stand-By Commitment. The Stand-By Commitment is attached as Exhibit 1. Notwithstanding anything in the forgoing to the contrary, Albert Fried & Co. LP shall be released from its obligations under its Stand-By Commitment and the Debtor shall be released from its obligation to pay Albert Fried & Co. a stand-by commitment fee in the event that Albert Fried & Co. LP funds what is commonly referred to as the "tranche c" portion of the New Term Loan.

198.    The Third Plan contained several provisions relating to future modification of the Third Plan, including Section 13.05, which states, as follows:

13.05 Modification of Plan.  The Plan Proponents reserve the right, in accordance with the Code, to amend or modify the Plan prior to the entry of the Confirmation Order.  After entry of the Confirmation Order, the Plan Proponents may, upon order of this Court, amend or modify the Plan in accordance with section 1127(b) of the Code, remedy any defect or omission, or reconcile any inconsistency in the Plan, as may be necessary to carry out the purpose and intent of the Plan.

199.    The Third Plan was not modified in accordance with its provisions.

200.    No party ever requested that this Court approve a modification of the Third Plan.

201.    No party ever filed a notice indicating the Third Plan had been modified or that the Third Plan was implemented in a manner inconsistent with the Third Plan and its Disclosure Statement.

202.    There was never any modification of the Third Plan and the Disclosure Statement's description of the treatment of the Williams Farm Property.

203.    The granting of the option on the Williams Farm Property was contrary to the provisions of the Third Plan and Disclosure Statement.

204.     On or around December 20, 2000, the Williams Farm Property was purportedly transferred to Williams Farm LLC by Company; however, the incorrect name was used in the deed of transfer, because record title to the Williams Farm Property remained in Basic Manufacturing and Technologies of Utah, Inc.

205.     Based on the recommendation and nomination of Fried, the following individuals were named as the members of the board of managers of Geneva Steel LLC, the Reorganized Debtor, and as the board of directors of Holdings:

*Class I directors were*: 1. R. J. Shopf of New Orleans, Louisiana; 2.  Frank T. MacInnis of Norwalk, Connecticut; and 3. Murray Drabkin, Washington, D.C.

*Class II directors were*:  1. Ken Johnsen, Geneva Steel Co.; 2. Albert Fried, Jr. Albert Fried & Co. LLP, New York City; 3. A. Stanley West of Cleveland, Ohio; and 4. John LaMacchia.

*Class III directors were*: 1.  Joseph A. Cannon of Geneva Steel Co.; 2. Donald R. Shepherd, Rancho Santa Fe, California; and 3.  Michael T. Yonkers, of Oak Brook, Illinois.

206.     Upon information and belief, at all times pertinent hereto, Fried controlled a majority of the directors and controlled and directed their votes on major issues presented to the boards.

207.     The Holdings board made most material decisions relating to the subsidiaries of Holdings, including Williams Farm LLC.

208.     As part of the consummation of the Third Plan, stock in Holdings was issued to creditors of Company.

209.    Approximately 20% of the stock of Holdings was issued to AFCO on account of its $60 million claim as a bondholder of Company.

210.    Approximately 20% of the stock of Holdings was issued to Loomis Sayles & Co. on account of its $60 million claim as a bondholder of Company.

211.    At the time of the approval of the Third Plan, the Pension Benefit Guaranty Corporation ("PBGC") made a claim against Company.

212.    The Order confirming the Third Plan stated that the PBGC claim should remain unaffected by the Third Plan and that no claims relating to the Geneva Pension Plan shall be deemed to have been discharged.

213.    Because of the operation of various federal statutes relating to the claims of the PBGC, Holdings and its subsidiaries are jointly and severally liable for the PBGC claim.

214.    PBGC asserts that its claim against the Debtors is in excess of $40 million.

215.    Payment of the PBGC claim therefore benefits each of the Debtors' estates.

**Option on Williams Farm Demanded by AFCO**

216.    Notwithstanding its obligation to fund the Tranche C loan, shortly before the closing on the Exit Credit Facility, AFCO, through Garcia demanded an option to purchase the Williams Farm Property for the purchase price of $1 million.

217.    At the time the option was demanded, the Williams Farm Property had a fair market value in excess of $5 million.

218.    Based upon the fair market value of the Williams Farm Property, the Williams Farm Option had a value of at least $4 million.

219.   Upon information and belief, the officers of Company agreed to submit for approval the proposed option on the Williams Farm Property to the Holdings' Board, the Managers of the Reorganized Debtor and the Board of Managers of Williams Farm LLC, after the funding of the Tranche C loan.

220.   The grant of the option to AFCO from Williams Farm LLC was made without bankruptcy court approval and without disclosure to the creditors in the bankruptcy case of Company.

221.   Because the Third Plan required any amendments to be approved by this Court, to comply with the provisions of the Third Plan and the Bankruptcy Code, notice and a hearing before this Court was required to approve any material change in the Exit Financing.

222.   Garcia and KS knew or should have known that a material change in the terms of the Tranche C loan (by granting loan fees of approximately $4 million on an approximate $10 million loan and increasing the interest rate) required approval of the Bankruptcy Court.

223.   Based on the fair market value of the Williams Farm Property, the loan fees ultimately transferred to AFCO exceeded 50% of the loan amount.

224.   Notwithstanding that knowledge, Garcia and KS never requested or authorized the appropriate parties to submit the new terms and fees of the Tranche C loan for approval by the Bankruptcy Court.

225.   The granting of the option on the Williams Farm Property was without any consideration to Williams Farm LLC.

226.   During the negotiations of the option, Garcia and Hopkins & Sutter acted in the capacity of legal counsel and represented the interests of Fried, and AFCO.

227.    Upon information and belief, Johnsen and members of the Holdings Board were aware of the fact that Garcia represented Fried and AFCO as legal counsel in matters pertaining to the negotiations on the Tranche C loan, although no conflict waiver was ever signed.

228.    Garcia and Hopkins & Sutter on behalf of AFCO prepared most of the loan documents pertaining to the Tranche C loan, including the Fee Commitment Letter and Exhibit A attached thereto, and billed those fees to the bankruptcy estate as counsel for the Bondholders Committee.

229.    Garcia knew or should have known of his conflicts of interest in negotiating on behalf of a creditor AFCO, at the same time Garcia and Hopkins & Sutter represented the Bondholders Committee.

230.    The consideration allegedly given by AFCO to Holdings, for the option on the Williams Farm Property was allegedly AFCO's willingness to participate on the Exit Credit Facility as a participant instead of as a lender.

231.    The difference between the position of lender and participant had no economic value whatsoever.

232.    Garcia and KS knew or should have known that no consideration was paid to Williams Farm LLC by AFCO for the purported grant of the option on the Williams Farm Property.

233.    The option on the Williams Farm Property required as a condition precedent the approval of the option by the boards of directors or managers of Williams Farm LLC, Holdings, and Geneva Steel LLC.

234.    Garcia and KS knew or should have known that there was no proper authority provided for the grant of the option.

## Plan Exit Financing Closing

235.     On or around January 3, 2001, the $110 million in exit financing, including the Tranche C loan was closed.

236.    The loan proceeds of the exit financing were used, in part, to satisfy the $3.5 million bridge loan to AFCO, to satisfy the debtor in possession loan, and to pay loan fees to the lenders.

237.    The Term Loan Agreement, signed by Geneva Steel LLC, contained numerous financial covenants, including a covenant requiring Geneva Steel LLC to maintain certain levels of liquidity.

238.    On or around January 3, 2001, the Tranche C Loan terms were amended between Geneva Steel LLC and AFCO.

239.    The term sheet for the Tranche C Loan was drafted and prepared by Garcia and Hopkins & Sutter as legal counsel for AFCO.

240.    One provision of the Tranche C Loan term sheet was the payment of loan fees in cash and issuance of stock in Holdings.

241.    As provided in the Tranche C Loan, the stock issued pursuant to the Tranche C Loan was restricted pursuant to Rule 144 of the Rules and Regulations of the Securities and Exchange Commission.

242.    As restricted stock, AFCO could not sell the stock for at least two years from its issuance by Holdings.

243.    The AFCO Tranche C Loan fee agreement was amended to provide that the obligation to fund the Tranche C Loan was not conditioned upon the grant of the option.

244.    AFCO agreed to fund the Tranche C Loan knowing that the option on the Williams Farm Property was required to be approved by the Holdings Board, and the boards of managers of Williams Farm LLC and Geneva Steel LLC.

245.    The approval of the grant of the option by the board of managers of Williams Farm LLC and the Geneva Managers in conformity with applicable law never occurred.

246.    On or around January 3, 2001, AFCO funded the Tranche C Loan, and executed a participation agreement with Citicorp North America, Inc. and other instruments necessary to close the Term Loan.

247.    On or around January 3, 2001, Geneva Steel LLC signed the Tranche C Loan Note for the benefit of AFCO.

248.    On or around January 3, 2001, Citicorp USA, Inc. signed and delivered to AFCO the Participation Certificate for the Tranche C Loan and AFCO accepted the participation.

**Williams Farm Option Granted to AFCO**

249.    AFCO funded the Tranche C loan before the option on the Williams Farm Property was executed and before approval by the required affiliates.

250.    In January 2001, Michael T. Yonker, Drabkin, and MacInnis were elected and qualified as the initial managers or directors of Williams Farm LLC by Holdings, the sole member of Williams Farm LLC.

251.    Upon information and belief, Michael T. Yonker, Drabkin, and MacInnis never held a meeting of the managers or directors in accordance with the provisions of Delaware

limited liability company laws to approve the grant of the option on the Williams Farm Property

to AFCO.

252.    Johnsen, as purported Manager of Williams Farm LLC, and AFCO signed an

option agreement, dated as of January 3, 2001 ("Williams Farm Option").

253.    The Williams Farm Option purported to grant to AFCO an option to purchase the

Williams Farm Property for $1 million.

254.    The Williams Farm Option was never approved by the board of directors or

managers of Williams Farm LLC as required by the terms of the Williams Farm LLC operating

agreement and Delaware limited liability company laws.

255.    Johnsen was not a manager of Williams Farm LLC at the time he signed the

Williams Farm Option.

256.    Even if the Williams Farm Option was valid, it contained several conditions

precedent that were never satisfied.

257.    The Williams Farm Option stated that AFCO did not condition grant of the

Williams Farm Option on the closing of the Tranche C loan.

258.    The Williams Farm Option was never approved by the Bankruptcy Court and was

never disclosed to the creditors in any paper or pleading filed in Company's bankruptcy case.

259.    On or around January 11, 2001, Holdings filed a Form 10-K with the U.S.

Securities & Exchange Commission.

260.    In the January 11, 2001, Form 10-K filed by Holdings, there is an

acknowledgement of the grant of an option to AFCO but subject to the approval of Holdings'

board, and the boards of managers of Williams Farm LLC and Geneva Steel LLC to become

effective.

261.     In subsequent securities filings made by Holdings, the Williams Farm Option was

described as a related party transaction.

(a)     As of January 15, 2001, Garcia and KS represented Holdings and

performed legal securities work for Holdings.

(b)     As of January 15, 2001, Garcia and KS owed a duty of loyalty to

Holdings, and its affiliates, including Williams Farm LLC and Geneva

Steel LLC.

(c)     An attorney-client relationship existed between the Debtors, and KS and

Garcia as of January 15, 2001.

(d)     In January, 2001 Garcia and KS were aware of the Reorganized Debtor's

strained liquidity.

262.     On or around January 26, 2001, Holdings' board met, with Garcia present, and

purportedly approved the grant of the Williams Farm Option to AFCO as a part of the repricing

of the Tranche C Loan.

(a)     Garcia and KS advised the Holdings' board of the reasons for the

Williams Farm Option.

(b)     Garcia and KS advised the Holdings' board to authorize and approve the

Williams Farm Option.

(c)     Garcia and KS failed to advise the Holdings' board that AFCO was

providing no consideration for the Williams Farm Option.

37

263.    Garcia and KS knew or should have known that AFCO gave no consideration to Holdings for the grant of the Williams Farm Option on the Williams Farm Property.

264.    AFCO gave no consideration to Williams Farm LLC for the grant of the Williams Farm Option on the Williams Farm Property.

265.    Garcia and KS knew that AFCO gave no consideration to Geneva Steel LLC for the grant of the Williams Farm Option on the Williams Farm Property.

266.    Garcia and KS knew or should have known that there was no approval of the grant of the Williams Farm Option by a properly convened board of directors or managers of Geneva Steel LLC or Williams Farm LLC.

267.    Garcia and KS knew or should have known that there was no fair consideration nor was any reasonably equivalent value provided to Holdings, Williams Farm LLC, or Geneva Steel LLC for the grant of the Williams Farm Option.

268.    Based on the value of the Williams Farm Property of approximately $5 million (based on the appraised value known by Fried) and consequently a value of the Williams Farm Option of $4 million, the effective interest rate yield on the Tranche C Loan was over 50% per annum.

269.    Garcia and KS breached their duty of care and their duty of loyalty to the Debtors by advising the Debtors to authorize and approve the Williams Farm Option on January 25 and 26, 2001.

270.    Garcia and KS possessed conflicting loyalties due to their conflicts of interest in the concurrent representation of the Debtors and Fried, AFCO, and their affiliates.

**Williams Farm Option Reduction Benefits AFCO**

271.    On or about August 14, 2001, the Holdings board held a regular meeting.

272.    Fried requested the Holdings' board to reduce the exercise price of the Williams Farm Option on the Williams Farm Property.

273.    Garcia and KS provided to the Holdings board the legal and business rationale of the reduction of the Williams Farm Option exercise price.

274.    Garcia and KS opined that because AFCO had not been able to sell its stock due to the lack of registration of the Holdings stock by Holdings, AFCO had lost value on stock that was to be freely tradable.

275.    Garcia's and KS's opinion was in error.

276.    Based on the presentation by Garcia of KS to the Holdings' board, the board approved a reduction of $781,369.69, in the exercise price of the Williams Farm Option on the Williams Farm Property as of the effective date of the registration statement for certain securities of Holdings (the "First Reduction").

277.    AFCO gave no consideration for the First Reduction of the exercise price of the Williams Farm Option on the Williams Farm Property.

278.    The First Reduction was based on the claim by AFCO that it was not able to sell its stock in Holdings for lack of registration.

279.    The Holdings board presentation package contained a copy of the Restriction Letter which provided as follows:

> The Borrower [Geneva Steel LLC] shall also pay AF&C the coupon described in paragraph (b), Exhibit A to the Commitment Letter as a nonrefundable fee in accordance with the following terms:

3% per annum payable in common stock of Geneva Steel Holdings Corp, a Delaware corporation (the "New Common Stock") as follows: (1) a number of shares of New Common Stock with a market value of $885,789.45 shall be payable within 35 business days after the Effective Date; and (2) a number of shares of New Common Stock with a market value of $590,526.30 shall be payable to the 4th anniversary of the Effective Date.

The payment of the fees in accordance with the terms of this letter involves the purchase and sale of securities. This transaction is being completed in reliance on an exemption from the registration requirements of federal and state securities laws. The certificate(s) representing the shares of New Common Stock will bear a 144 legend setting forth the restricted nature of the securities. In addition, AF&C will deliver an executed investment letter in the form attached as Exhibit "A", in connection with any issuance of New Common Stock under the terms of this letter.

Exhibit A to the Restriction Letter provided as follows:

In connection with the acquisition by the undersigned of shares of Common Stock of Geneva Steel LLC (the "Securities"), the undersigned represents that the Securities are being acquired without a view to, or for, resale in connection with any distribution of such Securities or any interest therein without registration or other compliance under the Securities Act of 1933, as amended (the "Securities Act"), and that the undersigned has no direct or indirect participation in any such undertaking or in the underwriting of such an undertaking.

The undersigned [Albert Fried & Co.] understands that the Securities have not been registered, but are being acquired by reason of a specific exemption under the Securities Act as well as under certain state statutes for transactions by issuer not involving any public offering and that any disposition of the subject Securities may, under certain circumstances, be inconsistent with this exemption and may make the undersigned an "underwriter" within the meaning of the Securities Act.

The undersigned acknowledges that the Securities must be held and may not be sold, transferred, or otherwise disposed of for value unless it is subsequently registered under the Securities Act or an exemption from such registration is available; the issuer is under no obligation to register the Securities under the Securities Act or under section 12 of the Securities Exchange Act of 1934, as amended, except as may be expressly agreed to by it in writing; if Rule 144 is available, and no assurance is given that it will be, initially only routine sales of such Securities in limited amounts

can be made in reliance on Rule 144 in accordance with the terms and conditions of that rule; the issuer is under no obligation to the undersigned to make Rule 144 available, except as may be expressly agreed to by it in writing; in the event Rule 144 is not available, compliance with Regulation A or some other exemption may be required before the undersigned can sell, transfer, or otherwise dispose of such Securities without registration under the Securities Act, the issuer's registrar and transfer agent will maintain a stop transfer order against the registration of transfer of the Securities…

280.    Garcia and KS held a direct conflict of interest due to Garcia's and KS's representation of AFCO and the Bondholders Committee and Garcia's personal brokerage account with AFCO.

281.    In conjunction with the approval of the First Reduction, the members of the Holdings board were not advised by Garcia or KS that the stock purportedly granted to AFCO under Tranche C Loan was Rule 144 Restricted Stock and could not be sold for at least one year from the issuance of the stock to AFCO.

282.    The First Reduction, based on the advice of Garcia and KS, resulted in an illegal and unlawful distribution to AFCO.

283.    Garcia and KS are liable at a minimum for the amount of the First Reduction for the unlawful distribution to AFCO in the amount of $781,369.69.

284.    Garcia and KS acted recklessly and in a grossly negligent manner, did not act in good faith and breached their duties of loyalty due to their actual and direct conflict of interest in advising Debtors about the First Reduction.

285.    On or around September 17, 2001, the registration statement for certain securities of Holdings became effective.

286.     As of September 17, 2001, Holdings declared that the exercise price of the Williams Farm Option on the Williams Farm Property was reduced from $1 million to $218,630.40 based on the Board resolution of August 14, 2001.

287.     There was no fair consideration nor was any reasonably equivalent value provided to Holdings, Williams Farm LLC, or Geneva Steel LLC for the First Reduction.

288.     Garcia and KS failed to advise the directors, managers or officers of their conflicts of interest and failed in their duty of loyalty to Holdings, Williams Farm LLC, and Geneva Steel LLC.

289.     By October 2001, Geneva Steel LLC was again in violation of the covenants on the Term Loan.

　　　　(a)     KS and Garcia prepared petitions for relief for each of the Debtors to file a chapter 11 petition.

290.     Meetings between senior management of Geneva Steel LLC, and senior management of the Term Loan lenders and attorneys for the parties took place in October and November 2001.

291.     The outcome of those meetings was that the Term Loan lenders would not continue to allow Geneva Steel LLC to operate its business in violation of the financial covenants of the Term Loan.

292.     On November 15, 2001, Geneva Steel LLC formally announced that it would shut down its steel making operations at the Geneva Steel mill in Vineyard, Utah, due in part to its liquidity crisis.

293.    Representatives of Geneva Steel LLC and the Term Loan lenders worked out a forbearance agreement among the parties allowing restricted use of cash proceeds.

294.    In February 2001, Garcia and KS knew or should have known that the Debtors were in the vicinity of insolvency or were actually insolvent.

295.    Notwithstanding that the Debtors were in the vicinity of insolvency or were actually insolvent, Garcia and KS failed to take actions to protect and preserve the assets of these Debtors for the benefit of their creditors.

296.    Instead, Garcia and KS represented the interests of Fried and AFCO, allowing the Williams Farm Option to be reduced to the detriment of the Debtors and for the benefit of AFCO.

297.    Garcia and KS breached their duty of loyalty to the Debtors.

298.    On or around December 21, 2001, Geneva Steel LLC repaid the revolving line of credit portion of the Exit Financing in full and an amended forbearance agreement was signed.

299.    On or around December 21, 2001, the Term Loan lenders permitted continuing use of cash proceeds but conditioned on Geneva Steel LLC filing a chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Utah.

**Geneva Steel LLC files Chapter 11**

300.    On or around January 16, 2002, the Holdings board met and approved the filing of a chapter 11 bankruptcy proceeding on behalf of the operating company, Geneva Steel LLC.

301.    The Holdings board controlled by Fried, authorized the hiring of Garcia and KS as legal counsel for the debtor in possession, notwithstanding the actual conflict of interest held by Garcia and KS because of their concurrent representation of AFCO, and its affiliates.

302.     The members of the board of managers of Geneva Steel LLC and the members of the Holdings board were aware that Garcia had previously represented the interests of AFCO and had a potential, if not actual, conflict of interest, yet none filed an objection to the application or to the accompanying declaration filed by Garcia and KS.

303.     On March 6, 2002, Garcia was admitted pro hac vice to practice before this Court.

304.     During the first few days of its bankruptcy case, Geneva Steel LLC sought the use of cash collateral from its secured creditors, including AFCO.

305.     The application for use of cash collateral and the statements made by Garcia and KS at the hearings on applications to approve the use of cash collateral failed to disclose:

(i) the high interest rate yield on the AFCO Tranche C Loan;

(ii) the granting to AFCO of the Williams Farm Option on the Williams Farm Property without bankruptcy court approval;

(iii) the reduction of the Williams Farm Option without consideration;

(iv) the fact that AFCO held an approximate 31% equity interest in Holdings, the parent company of Geneva Steel LLC, and thus held control over Geneva Steel LLC; and

(v) that the Exit Financing was structured differently than represented to the Court in the Third Plan and its disclosure statement.

306.     Garcia and KS knew that they held an actual conflict of interest due to their representation of AFCO.

307.     Garcia and KS knew of their connections to AFCO and their failure to disclose those connections, specifically including Garcia's brokerage account with AFCO.

308.    The opinions and reports made by Garcia and KS to the members of the board of

managers of Geneva Steel LLC, and the members of the Holdings board during the bankruptcy

case were tainted by their conflicting loyalties.

309.    Garcia and KS had an absolute duty to serve as independent counsel who did not

possess the conflicts of interest that burdened Garcia and KS.

310.    Based on the application by Geneva Steel LLC and statements made by Garcia on

the record at the hearing on January 28, 2002, the Bankruptcy Court approved the cash collateral

stipulation and application of Geneva Steel LLC.

311.    The failure of Garcia and KS to correct the misstatements and omissions in their

application for employment and in Garcia's statements at the hearing before the Bankruptcy

Court on January 28, 2002, violates 11 U.S.C. § 327 and Bankruptcy Rule 2014.

312.    During the first six months of the bankruptcy case, Garcia and KS performed

legal services for and on behalf of Fried and AFCO paid for by the Debtors.

313.    Garcia and KS, on behalf of Fried or AFCO, incorporated Steelman, Inc. in the

State of Delaware and prepared the initial legal papers for that entity.

314.    Garcia and KS negotiated for and on behalf of AFCO easements, title work, and

contracts.

315.    Garcia and KS performed development work on the Williams Farm Property for

Steelman, Inc. and/or Steelman Realty, both affiliates of Fried.

316.    On or around April 17, 2002, AFCO purportedly assigned the Williams Farm

Option on the Williams Farm Property to Steelman, Inc.

317.    On or around April 17, 2002, AFCO and Steelman, Inc. purportedly exercised the Williams Farm Option on the Williams Farm Property by providing notice of exercise of the Williams Farm Option to Williams Farm LLC and by providing notice of the assignment of the Williams Farm Option to Williams Farm LLC.

**Williams Farm Second Option Reduction Benefits AFCO**

318.    On or around April 23, 2002, again AFCO demanded that the Holdings board reduce the exercise price of the Williams Farm Option on the Williams Farm Property.

319.    Garcia and KS provided legal reasons and other information to the Holdings board, to support reduction of the exercise price of the Williams Farm Option by approximately $141,000 to $76,000 (the "Second Reduction").

320.    The reasons or grounds given for the Second Reduction of the Williams Farm Option exercise price were not appropriate.

321.    Garcia and KS failed to explain their failure to timely file the securities statements which formed part of the explanation for AFCO's demand for the Second Reduction of the Williams Farm Option.

322.    Garcia and KS provided reasons to justify the Second Reduction of the Williams Farms Option to cover their own malfeasance.

323.    Upon information and belief, the Debtors never obtained a release of claims from AFCO as a part of the alleged settlement with AFCO resulting in the Second Reduction.

324.    Garcia and KS breached their duties including their duty of care, duty of good faith, and duty of loyalty to the Debtors by failing to provide independent legal counsel with respect to the Second Reduction.

325.    The closing of the Williams Farm Option transaction caused the Debtors to suffer a loss in value in excess of $5,000,000.00

326.    On May 10, 2002, PBGC filed a notice of lien pursuant to 26 U.S.C. § 412(n) against the Williams Farm Property for approximately $925,000.

327.    After substantial efforts expended by representatives of Geneva Steel LLC, PBGC agreed to release the lien against the Williams Farm Property.

328.    By releasing the lien, the value of $925,000 in reduction of the PBGC claim was lost to the detriment of Geneva Steel LLC, Holdings and Iron Ore Mines LLC.

329.    On or around September 12, 2002, the Holdings board approved a recommendation by management that Holdings and its subsidiaries file for bankruptcy with Garcia and KS as lead counsel.

330.    On September 13, 2002, Garcia and KS possessed conflicts of interest at the time of the filing of the bankruptcy petitions for Holdings, Williams Farm LLC, Iron Ore Mines LLC, Vineyard Iron Company, Vineyard Management, and CPICOR Management.

331.    Garcia and KS were not disinterested due to their continued representation of Fried and AFCO, which were actual and substantial conflicts of interest and because of Garcia's personal brokerage account with AFCO.

332.    On September 13, 2002, Holdings, Williams Farm LLC, Iron Ore Mines LLC, Vineyard Iron Company, Vineyard Management and CPICOR Management filed chapter 11 bankruptcy petitions with the United States Bankruptcy Court for the District of Utah.

333.    Garcia and KS represented each of the Debtors as lead counsel for the debtors in possession.

334.    Garcia and KS failed to disclose their connections with AFCO in any of the papers filed with the bankruptcy court on behalf of Holdings, Williams Farm LLC, Iron Ore Mines LLC, Vineyard Iron Company, Vineyard Management, and CPICOR Management.

335.    On or around January 9, 2003, Fried, resigned from the Holdings board.

**Liquidation of Debtors' Assets**

336.    On or around February 4, 2003, Debtor Geneva Steel LLC filed a motion with the Bankruptcy Court to allow Debtor Geneva Steel LLC to begin the process of selling its assets.

337.    Geneva Steel LLC began interviewing real estate brokers, auctioneers, and other professionals to begin the process of liquidating Geneva Steel LLC's assets.

338.    Although Fried was no longer a member of the Holdings Board, Garcia regularly communicated with him on the status of the Debtors' liquidation of its assets in violation of his professional duty to protect confidential information.

339.    Garcia provided Fried with the Debtors' confidential information in violation of the Utah Rules of Professional Conduct.

340.    Fried caused Garcia to perform legal services on behalf of Fried and his affiliates.

341.    Bills of Garcia and KS for legal services for work that benefited Steelman, Inc. and Fried and AFCO were sent to Geneva Steel LLC for payment and were paid by Geneva Steel LLC.

342.    On June 13, 2003, Garcia and KS provided Fried with an opinion letter regarding the effect of the allocation of payments on AFCO's Tranche C Loan with Geneva Steel LLC and AFCO's potential claim against the other secured creditors of Geneva Steel LLC.

343.    The opinion of Garcia and KS was slanted in favor of a greater allocation to Fried and prejudicial to the Debtors' interests.

344.    Neither Garcia nor KS ever disclosed to this Court that Garcia and KS, as counsel for Geneva Steel LLC, was also representing AFCO with respect to allocation of payments on the Term Loan and potential claims that AFCO might assert against other secured creditors.

345.    Upon information and belief, on or about June 16, 2003, Garcia and KS shared with Fried confidential information pertaining to the filing of an application for a loan with the ESLGB, which information was not shared with the other secured creditors of Geneva Steel LLC.

346.    On or around August 7, 2003, Fried consulted with Garcia and KS on the preservation of his equity interest in Holdings.

347.    Upon information and belief, Garcia and KS, retained as counsel for Geneva Steel LLC, provided legal advice to assist Fried, in particular with respect to the "new value" principle and its application in a Chapter 11 plan of reorganization.

### Garcia Investment with Debtors' Officer, Directors, and Lender

348.     In late September and early October 2003, several telephone conferences and meetings were held among David Gardner, Fried, Garcia, Johnsen, and MacInnis, during which a preliminary agreement was reached between the parties for the investment in and development of real property located in Provo, Utah known as Trellis on the Green.

349.    Garcia and KS failed to disclose to this Court the joint investment of Garcia, one of the KS lawyers working as legal counsel for the Debtors, with Johnsen, CEO of Geneva Steel LLC, Cannon, Chairman of the Board of Geneva Steel LLC, MacInnis, a director of Holdings,

and Fried, a former director of Holdings, secured lender and Holdings' largest equity security holder.

350.    The Steelman Realty, LLC organizational agreement drafted by Garcia and KS lists its members as Cannon, Johnsen, Garcia, David Gardner, Fried, and MacInnis.

351.    Cannon, Johnsen, and David Gardner received their equity interests for alleged in-kind contributions.

352.    Johnsen was appointed by the members as CEO and manager of Steelman Realty, LLC.

353.    The initial capital contributions, member equity interests and their relationships were as follows:

Steelman Inc. $1.3 million for 32.5%.  (an affiliate of AFCO and Fried);

The Fried Group LLC.  $200,000 for 5%.  (an affiliate of AFCO and Fried);

Frank MacInnis $300,000 for 7.5%, a director of Debtors;

Stephen E. Garcia, $200,000 for 5%, counsel for Debtors;

Ken C. Johnsen in kind for 5%, CEO of Debtors;

Joseph A. Cannon in kind for 5%, Chairman of Debtors' board; and

David Gardner in kind for 40%.

354.    Garcia and KS prepared and then emailed the incorporation documents for Steelman Realty, LLC to Fried, Johnsen and David Gardner.

355.    Fried, Christina Fried, and Johnsen were appointed to the board of managers, by the unanimous written consent in lieu of first meeting of members of Steelman Realty, LLC.

356.    Garcia and KS performed other legal services for Steelman Realty, LLC specifically including preparation of legal pleadings for filing in a Utah court and a personal appearance by Garcia at a settlement conference in that proceeding.

357.    The business relationship among Fried, Johnsen, Garcia, Cannon, and MacInnis in the Trellis on the Green venture, was not disclosed as required to the Bankruptcy Court or the Debtors' creditors until March 2005.

**Garcia Supports Efforts of Silver Point and AFCO Adverse to Unsecured Creditors**

358.    In 2004, Silver Point Capital acquired the unguaranteed portion of the Term Loan from Citibank.

359.    In early 2004, AFCO made a joint proposal with Silver Point Capital to purchase the assets of Geneva Steel LLC, which offer was made with confidential information that had been provided to AFCO by Garcia.

360.    The offer was for approximately $100 million even though the liquidation value of the assets was higher than that amount as determined by the appraisals and evaluations prepared for Geneva Steel LLC.

361.    The results of the appraisals and evaluations were shared with Fried, (the principal of AFCO) by Garcia and Johnsen.

362.    Fried insisted to Garcia and KS that the information pertaining to the various plans proposed by AFCO and other third parties interested in acquiring the assets of Geneva Steel LLC not be provided to the unsecured creditors committee of Geneva Steel LLC.

363.    During late spring early summer of 2004, Fried, Johnsen, Garcia and KS developed a plan of reorganization incorporating the concept of a liquidating limited liability

company that would survive Geneva Steel LLC and into which Geneva Steel's assets would be transferred.

364.    The membership interests in the limited liability company would be owned by management, principally Johnsen, AFCO, and a small percentage reserved for the unsecured creditors of Geneva Steel LLC.

365.    The limited liability company would be managed by a board of managers controlled by AFCO.

366.    With inside knowledge held by Johnsen, Garcia, KS, and Fried that the value of the assets of Geneva Steel LLC was far in excess of the amount of the secured claims against those assets, and with the knowledge of potential sales transactions that would satisfy AFCO's debt in full, Fried continued to insist that any plan proposed by Geneva Steel LLC provide AFCO an inordinately high interest rate and equity participation in the liquidating limited liability company, and control over the liquidating limited liability company.

367.    Because the plan would not be confirmed if the inside information on the values of assets were known to the creditor body at large, Fried, Johnsen, KS and Garcia agreed not to disseminate the actual values to those outside of their control and to keep the approximate values within their exclusive control.

368.    During early summer 2004, Johnsen was presented with several proposed contracts on Geneva Steel LLC's real property.

369.    Pursuant to the scheme among Johnsen, Garcia, KS, and Fried, information regarding proposed asset sales for more than the amounts owing to secured creditors were discouraged by Johnsen.

370. Fried was aware of offers to Geneva Steel LLC that were rejected by Johnsen that would have paid the secured creditors, including AFCO, in full and would have provided for some return to unsecured creditors in a bulk sale of Geneva Steel LLC's assets.

371. Fried was aware that the offers were based on valuations of the water rights of Geneva Steel LLC that were approximately $50 million to $70 million less than the appraised value and actual values.

372. If the true value of the water rights had been made known to the potential purchasers, the amount of the purchase price of the proposed bulk purchase acquisitions may have provided a substantial return to unsecured creditors.

373. During the summer of 2004 negotiations occurred between members of Debtors' management, including Johnsen, and various third parties for the purchase of Geneva Steel LLC's water rights.

374. Fried was informed by Johnsen and Garcia of the potential value of the water rights in the range between $75 million and $100 million.

375. The negotiations were deliberately kept confidential to prevent the unsecured creditors of Geneva Steel LLC from learning the true potential value of the water rights.

376. Fried was made privy to the information pertaining to the water rights.

377. On or around August 19, 2004, Geneva Steel LLC filed a Motion for Entry of Order Approving a Preconfirmation Distribution to the Secured Lenders.

378. AFCO was one of the Secured Lenders specifically mentioned in the Motion.

379.    During September 2004, Garcia and KS provided legal counsel and assistance to AFCO on the issue of the allocation of payments on the secured creditors' loans and payment of the default interest payments to AFCO on the Tranche C Loan.

380.    At the time, Garcia and KS were legal counsel for Geneva Steel LLC, Holdings, Iron Ore Mines LLC, and Williams Farm LLC and the advice provided was contrary to the interests of the Debtors and constituted a direct actual conflict of interest.

381.    AFCO filed a pleading requesting that the payments be allocated in a specific manner most favorable to AFCO.

382.    On or around September 14, 2004, the Court entered an order requiring Geneva Steel LLC to file a disclosure statement and plan within ten days.

383.    Other interested parties were given the right to thereafter file competing disclosure statements and plans.  Because of this order, AFCO, Johnsen and Garcia entered into an informal agreement to propose a plan of reorganization that would allow Fried and his affiliates, including AFCO to maintain control over the liquidation of Geneva Steel LLC's assets.

384.    During September and early October 2004, Geneva Steel LLC through Johnsen, KS, and Garcia proposed several plans of reorganization to the secured and unsecured creditors.

385.    The plans proposed were consistent with the scheme developed by Johnsen, Fried, and Garcia, and provided for reserving interests for management, particularly Johnsen, providing AFCO with an inordinately high interest rate and granting Fried control over the liquidating limited liability company and established a liquidating limited liability company ("Liquidating LLC") as the vehicle for future liquidations of assets of Geneva Steel LLC.

386.    On or around October 22, 2004, Johnsen, Garcia, and Fried entered into an undisclosed agreement relating to the proposed plan of reorganization in furtherance of their scheme to deny recovery to the unsecured creditors.

387.    The arrangement guaranteed to AFCO a 27% return on its secured debt and ten percent of the equity in the Liquidating LLC.

388.    The proposed arrangement guaranteed Fried management control of the Liquidating LLC.

389.    At the same time, Johnsen instructed Garcia to misrepresent to the unsecured creditors committee that it would share management control of the Liquidating LLC with Fried and that Johnsen would be the neutral deciding vote.

390.    Pursuant to their undisclosed agreement, Johnsen's vote would give Fried control over the Liquidating LLC.

391.    On October 25, 2004, at the behest of Garcia and Fried, Johnsen presented to the Holdings board the plan of reorganization that had been agreed upon by Garcia, Johnsen, and Fried ("Fried Plan").

392.    Without sufficient time to review the proposed Fried Plan, the Holdings Board approved the filing of the Fried Plan.

393.    The Fried Plan was presented as the best plan that could be offered by Geneva Steel LLC, even though Garcia and KS knew or should have known that the Fried Plan was intended to unfairly benefit its conflicting clients, Fried and AFCO, at the substantial detriment of the unsecured creditors.

394.    On or around December 28, 2004, at the request of Fried, Garcia and KS prepared the organizational documents of Trellis on the Green, LLC (hereafter "Trellis"), a real estate development company.

395.    Johnsen suffered from periods of impairment that prevented him from performing his duties to Geneva Steel LLC.

396.    At key points during the attempted reorganization, management of Geneva Steel LLC advised Garcia of Johnsen's impairment and inability to manage the Debtors.

397.    Garcia and KS had a duty to advise the Holdings Board of the reported impairment of Johnsen but failed to do so because of their divided loyalties.

398.    On or around December 28, 2004, at the request of Fried, Garcia and KS organized Vineyard Investment Company ("VIC").

399.    VIC was organized to assume the position of AFCO under the plan of reorganization proposed by Fried and Geneva Steel LLC.

400.    During the month of January 2005, negotiations and discussions with various parties concerning the plan of reorganization occurred.

401.    To avoid competing with the plan being prepared by Silver Point Capital, Garcia, Fried, and Johnsen met with principals of Silver Point Capital to jointly propose a plan.

402.    On January 28, 2005, at the request of Garcia and Fried, Johnsen recommended to the Holdings board that it file a joint plan of Geneva Steel LLC with Silver Point Capital, incorporating the Fried Plan (hereafter called the "Joint Plan.").

403.    Garcia and KS was authorized by Holdings to file the Joint Plan.

404.     This Joint Plan continued to provide AFCO with an excessive 27% interest rate and increased the interest rate to Silver Point Capital to 27% interest.

405.     The Debtors could have refinanced the debts of AFCO and Silver Point Capital at a much lower interest rate or forced a lower interest rate on secured lenders if they had been advised by legal counsel without the conflicts of interest of Garcia and KS.

406.     The unsecured creditors committee and a third party, Anderson Geneva, filed competing plans.

407.     Subsequent to the filing of the competing plans, the Bankruptcy Court appointed Joel T. Marker as an examiner in Geneva Steel LLC (the "Examiner").

408.     After an investigation, the Examiner filed a report disclosing some of the conflicts of interest held by Garcia and KS.

409.     At this point Garcia and KS filed their supplemental declaration disclosing those conflicts of which the Examiner or parties in interest had uncovered, but that supplemental declaration was deceptively misleading because it failed to disclose the other conflicts and connections as set forth herein.

410.     When the disclosed conflicts were brought to light in the bankruptcy case, the Official Committee Unsecured Creditors and the U.S. Trustee demanded the appointment of a chapter 11 trustee.

411.     At all times pertinent hereto, Garcia and KS were required to be disinterested and had a duty of loyalty to the Debtors to exercise independent judgment and provide independent legal advice, unburdened by conflicts of interest.

412.     At all times pertinent hereto, Garcia, and KS were required to comply with the
Bankruptcy Code and applicable rules, the Utah Rules of Professional Conduct and case law
with respect to disclosure of connections, conflicts of interest, loyalties, and independence.

413.     On or about February 14, 2001, KS billed Holdings $32,556.39 for legal services
performed in January 2001.

414.     On or about February 14, 2001, KS billed Company $36,598.44 for legal services
performed in January 2001.

415.     On or about March 12, 2001, KS billed Company $12,204.55 for legal services
performed in February 2001.

416.     On or about March 12, 2001, KS billed Holdings $59,753.33 for legal services
performed in February 2001.

417.     On or about April 18, 2001, KS billed Company $38,426.50 for legal services
performed in March 2001.

418.     On or about April 18, 2001, KS billed Holdings $59,055.91 for legal services
performed in March 2001.

419.     On or about May 9, 2001, KS billed Holdings $27,180.42 for legal services
performed in April 2001.

420.     On or about May 9, 2001, KS billed Company $27,744.52 for legal services
performed in April 2001.

421.     On or about June 26, 2001, KS billed Company $25,508.90 for legal services
performed in May 2001.

422.    On or about June 26, 2001, KS billed Holdings $40,595.37 for legal services performed in May 2001.

423.    On or about July 18, 2001, KS billed Holdings $7,622.86 for legal services performed in June 2001.

424.    On or about July 18, 2001, KS billed Company $56,547.26 for legal services performed in June 2001.

425.    On or about August 20, 2001, KS billed Company $27,282.06 for legal services performed in July 2001.

426.    On or about August 16, 2001, KS billed Holdings $7,358.19 for legal services performed in July 2001.

427.    On or about September 17, 2001, KS billed Holdings $23,818.78 for legal services performed in August 2001.

428.    On or about September 17, 2001, KS billed Company $33,674.12 for legal services performed in August 2001.

429.    On or about September 26, 2001, KS billed Holdings $214,422.11 for legal services performed throughout 2001 with respect to registration of securities.

430.    On or about October 16, 2001, KS billed Company $3,846.56 for legal services performed in September 2001.

431.    On or about October 16, 2001, KS billed Holdings $21,827.09 for legal services performed in September 2001.

432.    On or about October 16, 2001, KS billed Holdings $17,303.50 for legal services performed in September 2001.

433.    On or about November 8, 2001, KS billed Holdings $18,050.11 for legal services performed in October 2001.

434.    On or about November 8, 2001, KS billed Holdings $33,078.75 for legal services performed in October 2001.

435.    On or about November 8, 2001, KS billed Holdings $120,920.55 for legal services performed in October 2001.

436.    On or about November 8, 2001, KS billed Company $1,799.10 for legal services performed in October 2001.

437.    On or about December 7, 2001, KS billed Holdings $48,086.79 for legal services performed in November 2001.

438.    On or about December 7, 2001, KS billed Holdings $102,880.81 for legal services performed in November 2001.

439.    On or about December 7, 2001, KS billed Holdings $17,785.34 for legal services performed in November 2001.

440.    On or about December 7, 2001, KS billed Holdings $10,006.09 for legal services performed in November 2001.

441.    On or about December 31, 2001, KS billed Holdings $9,547.54 for legal services performed in December 2001.

442.    On or about December 31, 2001, KS billed Holdings $7,337.80 for legal services performed in December 2001, and included a discount of $71,040.00.

443.    On or about January 17, 2002, KS billed Holdings $6,204.10 for legal services performed in January 2002.

444.    On or about January 17, 2002, KS billed Holdings $31,010.85 for legal services performed in January 2001.

**Payments to Kaye Scholer**

445.    On or about May 26, 2001, Geneva Steel LLC transferred by check $141,112.71 to KS.

(a)    The money transferred was property of Geneva Steel LLC.

(b)    The money transferred was for the benefit of KS.

(c)    The money transferred was on account of an antecedent debt owed to KS.

(d)    The money was transferred while Geneva Steel LLC was insolvent.

(e)    The money was transferred to KS within the year prior to Geneva Steel filing its petition for relief and KS was an insider.

(f)    The money transferred to KS enabled KS to receive more than if the bankruptcy estate was liquidated under chapter 7 of the Bankruptcy Code.

(g)    The money transferred was not a contemporaneous exchange for new value provided by KS.

(h)    The money was not transferred to KS in the ordinary course of business.

(i)    Geneva Steel LLC received less than reasonably equivalent value in exchange for the money transferred.

(j)    Geneva Steel LLC was engaged in business at the time of the transfer for which it had unreasonably small capital.

(k)    Geneva Steel LLC at the time of the transfer had incurred debts that were beyond its ability to pay upon maturity.

446.    On or about June 29, 2001, Geneva Steel LLC transferred by check $97,975.02 to KS.

(a)    The money transferred was property of Geneva Steel LLC.

(b)    The money transferred was for the benefit of KS.

(c)    The money transferred was on account of an antecedent debt owed to KS.

(d)    The money was transferred while Geneva Steel LLC was insolvent.

(e)    The money was transferred to KS within the year prior to Geneva Steel filing its petition for relief and KS was an insider.

(f)    The money transferred to KS enabled KS to receive more than if the bankruptcy estate was liquidated under chapter 7 of the Bankruptcy Code.

(g)    The money transferred was not a contemporaneous exchange for new value provided by KS.

(h)    The money was not transferred to KS in the ordinary course of business.

(i)    Geneva Steel LLC received less than reasonably equivalent value in exchange for the money transferred.

(j)    Geneva Steel LLC was engaged in business at the time of the transfer for which it had unreasonably small capital.

(k)    Geneva Steel LLC at the time of the Transfer had incurred debts that were beyond its ability to pay upon maturity.

447.    On or about July 24, 2001, Geneva Steel LLC transferred by check $54,924.94 to KS.

(a)    The money transferred was property of Geneva Steel LLC.

(b)    The money transferred was for the benefit of KS.

(c)    The money transferred was on account of an antecedent debt owed to KS.

(d)    The money was transferred while Geneva Steel LLC was insolvent.

(e)    The money was transferred to KS within the year prior to Geneva Steel

filing its petition for relief and KS was an insider.

(f)    The money transferred to KS enabled KS to receive more than if the

bankruptcy estate was liquidated under chapter 7 of the Bankruptcy Code.

(g)    The money transferred was not a contemporaneous exchange for new

value provided by KS.

(h)    The money was not transferred to KS in the ordinary course of business.

(i)    Geneva Steel LLC received less than reasonably equivalent value in

exchange for the money transferred.

(j)    Geneva Steel LLC was engaged in business at the time of the transfer for

which it had unreasonably small capital.

(k)    Geneva Steel LLC at the time of the Transfer had incurred debts that were

beyond its ability to pay upon maturity.

448.    On or about September 26, 2001, Geneva Steel LLC transferred by check

$66,104.27 to KS.

(a)    The money transferred was property of Geneva Steel LLC.

(b)    The money transferred was for the benefit of KS.

(c)    The money transferred was on account of an antecedent debt owed to KS.

(d)    The money was transferred while Geneva Steel LLC was insolvent.

(e)     The money was transferred to KS within the year prior to Geneva Steel filing its

petition for relief and KS was an insider.

(f)     The money transferred to KS enabled KS to receive more than if the bankruptcy

estate was liquidated under chapter 7 of the Bankruptcy Code.

(g)     The money transferred was not a contemporaneous exchange for new value

provided by KS.

(h)     The money was not transferred to KS in the ordinary course of business.

(i)     Geneva Steel LLC received less than reasonably equivalent value in exchange for

the money transferred.

(j)     Geneva Steel LLC was engaged in business at the time of the transfer for which it

had unreasonably small capital.

(k)     Geneva Steel LLC at the time of the Transfer had incurred debts that were beyond

its ability to pay upon maturity.

449.    On or about November 7, 2001, Geneva Steel LLC transferred by check

$98,810.57 to KS.

(a)     The money transferred was property of Geneva Steel LLC.

(b)     The money transferred was for the benefit of KS.

(c)     The money transferred was on account of an antecedent debt owed to KS.

(d)     The money was transferred while Geneva Steel LLC was insolvent.

(e)     The money was transferred to KS within the year prior to Geneva Steel filing its

petition for relief and KS was an insider.

(f)     The money transferred to KS enabled KS to receive more than if the bankruptcy estate was liquidated under chapter 7 of the Bankruptcy Code.

(g)     The money transferred was not a contemporaneous exchange for new value provided by KS.

(h)     The money was not transferred to KS in the ordinary course of business.

(i)     Geneva Steel LLC received less than reasonably equivalent value in exchange for the money transferred.

(j)     Geneva Steel LLC was engaged in business at the time of the transfer for which it had unreasonably small capital.

(k)     Geneva Steel LLC at the time of the Transfer had incurred debts that were beyond its ability to pay upon maturity.

450.    On or about November 1, 2001, Geneva Steel LLC transferred by wire $327,303.03 to KS.

(a)     The money transferred was property of Geneva Steel LLC.

(b)     The money transferred was for the benefit of KS.

(c)     The money transferred was on account of an antecedent debt owed to KS.

(d)     The money was transferred while Geneva Steel LLC was insolvent.

(e)     The money was transferred to KS within 90 days prior to Geneva Steel LLC filing its petition for relief.

(f)     The money transferred to KS enabled KS to receive more than if the bankruptcy estate was liquidated under chapter 7 of the Bankruptcy Code.

(g)     The money transferred was not a contemporaneous exchange for new value

         provided by KS.

(h)     The money was not transferred to KS in the ordinary course of business.

(i)     Geneva Steel LLC received less than reasonably equivalent value in exchange for

         the money transferred.

(j)     Geneva Steel LLC was engaged in business at the time of the transfer for which it

         had unreasonably small capital.

(k)     Geneva Steel LLC at the time of the Transfer had incurred debts that were beyond

         its ability to pay upon maturity.

451.     On or about November 14, 2001, Geneva Steel LLC transferred by wire

$108,800.00 to KS.

(a)     The money transferred was property of Geneva Steel LLC.

(b)     The money transferred was for the benefit of KS.

(c)     The money transferred was on account of an antecedent debt owed to KS.

(d)     The money was transferred while Geneva Steel LLC was insolvent.

(e)     The money was transferred to KS within 90 days prior to Geneva Steel LLC filing

         its petition for relief.

(f)     The money transferred to KS enabled KS to receive more than if the bankruptcy

         estate was liquidated under chapter 7 of the Bankruptcy Code.

(g)     The money transferred was not a contemporaneous exchange for new value

         provided by KS.

(h)     The money was not transferred to KS in the ordinary course of business.

(i)     Geneva Steel LLC received less than reasonably equivalent value in exchange for the money transferred.

(j)     Geneva Steel LLC was engaged in business at the time of the transfer for which it had unreasonably small capital.

(k)     Geneva Steel LLC at the time of the Transfer had incurred debts that were beyond its ability to pay upon maturity.

452.    On or about December 12, 2001, Geneva Steel LLC transferred by wire $50,000.00 to KS.

(a)     The money transferred was property of Geneva Steel LLC.

(b)     The money transferred was for the benefit of KS.

(c)     The money transferred was on account of an antecedent debt owed to KS.

(d)     The money was transferred while Geneva Steel LLC was insolvent.

(e)     The money was transferred to KS within 90 days prior to Geneva Steel LLC filing its petition for relief.

(f)     The money transferred to KS enabled KS to receive more than if the bankruptcy estate was liquidated under chapter 7 of the Bankruptcy Code.

(g)     The money transferred was not a contemporaneous exchange for new value provided by KS.

(h)     The money was not transferred to KS in the ordinary course of business.

(i)     Geneva Steel LLC received less than reasonably equivalent value in exchange for the money transferred.

(j)     Geneva Steel LLC was engaged in business at the time of the transfer for which it
had unreasonably small capital.

(k)     Geneva Steel LLC at the time of the Transfer had incurred debts that were beyond
its ability to pay upon maturity.

453.    On or about December 28, 2001, Geneva Steel LLC transferred by wire
$35,000.00 to KS.

(a)     The money transferred was property of Geneva Steel LLC.

(b)     The money transferred was for the benefit of KS.

(c)     The money transferred was on account of an antecedent debt owed to KS.

(d)     The money was transferred while Geneva Steel LLC was insolvent.

(e)     The money was transferred to KS within 90 days prior to Geneva Steel LLC filing
its petition for relief.

(f)     The money transferred to KS enabled KS to receive more than if the bankruptcy
estate was liquidated under chapter 7 of the Bankruptcy Code.

(g)     The money transferred was not a contemporaneous exchange for new value
provided by KS.

(h)     The money was not transferred to KS in the ordinary course of business.

(i)     Geneva Steel LLC received less than reasonably equivalent value in exchange for
the money transferred.

(j)     Geneva Steel LLC was engaged in business at the time of the transfer for which it
had unreasonably small capital.

(k)     Geneva Steel LLC at the time of the Transfer had incurred debts that were beyond its ability to pay upon maturity.

454.    On or about January 4, 2002, Geneva Steel LLC transferred by wire $20,000.00 to KS.

(a)     The money transferred was property of Geneva Steel LLC.

(b)     The money transferred was for the benefit of KS.

(c)     The money transferred was on account of an antecedent debt owed to KS.

(d)     The money was transferred while Geneva Steel LLC was insolvent.

(e)     The money was transferred to KS within 90 days prior to Geneva Steel LLC filing its petition for relief.

(f)     The money transferred to KS enabled KS to receive more than if the bankruptcy estate was liquidated under chapter 7 of the Bankruptcy Code.

(g)     The money transferred was not a contemporaneous exchange for new value provided by KS.

(h)     The money was not transferred to KS in the ordinary course of business.

(i)     Geneva Steel LLC received less than reasonably equivalent value in exchange for the money transferred.

(j)     Geneva Steel LLC was engaged in business at the time of the transfer for which it had unreasonably small capital.

(k)     Geneva Steel LLC at the time of the Transfer had incurred debts that were beyond its ability to pay upon maturity.

455.   On or about January 15, 2002, Geneva Steel LLC transferred by wire $165,760.87 to KS.

(a)   The money transferred was property of Geneva Steel LLC.

(b)   The money transferred was for the benefit of KS.

(c)   The money transferred was on account of an antecedent debt owed to KS.

(d)   The money was transferred while Geneva Steel LLC was insolvent.

(e)   The money was transferred to KS within 90 days prior to Geneva Steel LLC filing its petition for relief.

(f)   The money transferred to KS enabled KS to receive more than if the bankruptcy estate was liquidated under chapter 7 of the Bankruptcy Code.

(g)   The money transferred was not a contemporaneous exchange for new value provided by KS.

(h)   The money was not transferred to KS in the ordinary course of business.

(i)   Geneva Steel LLC received less than reasonably equivalent value in exchange for the money transferred.

(j)   Geneva Steel LLC was engaged in business at the time of the transfer for which it had unreasonably small capital.

(k)   Geneva Steel LLC at the time of the Transfer had incurred debts that were beyond its ability to pay upon maturity.

456.   On or about January 22, 2002, Geneva Steel LLC transferred by wire $28,109.71 to KS.

(a)   The money transferred was property of Geneva Steel LLC.

(b)     The money transferred was for the benefit of KS.

(c)     The money transferred was on account of an antecedent debt owed to KS.

(d)     The money was transferred while Geneva Steel LLC was insolvent.

(e)     The money was transferred to KS within 90 days prior to Geneva Steel LLC filing its petition for relief.

(f)     The money transferred to KS enabled KS to receive more than if the bankruptcy estate was liquidated under chapter 7 of the Bankruptcy Code.

(g)     The money transferred was not a contemporaneous exchange for new value provided by KS.

(h)     The money was not transferred to KS in the ordinary course of business.

(i)     Geneva Steel LLC received less than reasonably equivalent value in exchange for the money transferred.

(j)     Geneva Steel LLC was engaged in business at the time of the transfer for which it had unreasonably small capital.

(k)     Geneva Steel LLC at the time of the Transfer had incurred debts that were beyond its ability to pay upon maturity.

457.     On or about January 25, 2002, Geneva Steel LLC transferred by wire $60,000.00 to KS.

(a)     The money transferred was property of Geneva Steel LLC.

(b)     The money transferred was for the benefit of KS.

(c)     The money transferred was on account of an antecedent debt owed to KS.

(d)     The money was transferred while Geneva Steel LLC was insolvent.

(e)     The money was transferred to KS within 90 days prior to Geneva Steel LLC filing

its petition for relief.

(f)     The money transferred to KS enabled KS to receive more than if the bankruptcy

estate was liquidated under chapter 7 of the Bankruptcy Code.

(g)     The money transferred was not a contemporaneous exchange for new value

provided by KS.

(h)     The money was not transferred to KS in the ordinary course of business.

(i)     Geneva Steel LLC received less than reasonably equivalent value in exchange for

the money transferred.

(j)     Geneva Steel LLC was engaged in business at the time of the transfer for which it

had unreasonably small capital.

(k)     Geneva Steel LLC at the time of the Transfer had incurred debts that were beyond

its ability to pay upon maturity.

**Garcia and Kaye Scholer Failure to Disclose**

458.    Garcia and KS failed to inform this Court and Debtors of the potential claims

against KS pursuant to 11 U.S.C. §§ 547, 548 and 550.

459.    Garcia and KS analyzed Geneva Steel LLC records for potential claims that might

be asserted against vendors for preferences and fraudulent conveyances.

460.    Garcia and KS possessed an actual conflict of interest with respect to analyzing

avoidance actions because KS was the recipient of $1,253,901.12 within the seven month period

prior to Geneva Steel LLC's petition for relief.

## Claim 1 – Breach of Duty of Loyalty

461.    Garcia and KS had an attorney client relationship with the Debtors.

462.    The attorney client relationship with the Debtors is governed by the Bankruptcy Code and the Utah Rules of Professional Conduct.

463.    Garcia and KS owed a duty of disclosure to this Court, and to the Debtors and all of their creditors and parties in interest.

464.    All fees paid to Garcia and KS were paid by Geneva Steel LLC.

465.    Garcia and KS owed a duty of undivided loyalty to the Debtors, which includes an obligation of impeccable honesty, fair dealing, and fidelity.

466.    Garcia and KS were not honest, fair, faithful, or loyal.

467.    Garcia and KS had conflicts of interest with AFCO and Fried, and Johnsen which created unfaithfulness and divided loyalties with his duties to the Debtors.

468.    Garcia and KS had an actual conflict of interest in advising Geneva Steel LLC about potential avoidance actions against KS.

469.    Through the conduct described herein, Garcia and KS breached their duty of undivided loyalty, including the failure to advise the directors (with whom Garcia was not a business partner) of the impairment of Johnsen.

470.    Garcia and KS failed to disclose all of their connections with parties in interest in the Debtors' chapter 11 cases.

471.    Garcia knowingly and intentionally violated his duty of loyalty through his dishonesty, deceit, self dealing, and infidelity.

472.    The Debtors were substantially damaged as the result of Garcia's and KS's breaches of loyalty, actions, and failures as described herein.

## Claim 2 – Negligence

473.    Garcia and KS had an attorney client relationship with the Debtors.

474.    The attorney client relationship with the Debtors is governed by a standard of care.

475.    Garcia and KS owed a duty of care, including ordinary standards of professional competence.

476.    Garcia and KS failed to use the skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the tasks undertaken in the representation of the Debtors.

477.    Through the conduct described herein, Garcia and KS breached their duty of care and ordinary standards of professional competence.

478.    The Debtors were substantially damaged as the result of Garcia's and KS's negligence, actions, and failures as described herein.

## Claim 3 – 11 U.S.C. § 502(d)

479.    KS has filed claims against Geneva Steel LLC which claims remain unpaid.

480.    KS alleges entitlement to various administrative claims against the Debtors, some of which have been paid on an interim basis.

481.    All claims of KS should be disallowed because KS is a transferee of avoidable property of Geneva Steel LLC.

WHEREFORE, the Plaintiff respectfully requests, as follows:

1.      Termination of Garcia's admission pro hac vice; and

2.      For a judgment in favor of Plaintiff and against Garcia and KS for disgorgement of all fees and expense reimbursements paid to Garcia and KS and all benefits derived therefrom in an amount to be established at trial; and

3.      For disallowance of all claims of Garcia and KS, and all fees or reimbursements that Garcia and KS may claim; and

4.      For a judgment in favor of Plaintiff and against Garcia and KS for all damages for the breach of the duty of loyalty in an amount to be determined at the time of trial, including all actual and consequential damages, attorneys fees, interests, court costs and such additional relief as to the Court seems just and proper; and

5.      For a judgment in favor of Plaintiff and against Garcia and KS for damages from the breach of duty of care in an amount to be determined at the time of trial, including all actual and consequential damages, attorneys fees, interests, court costs and such additional relief as to the Court seems just and proper; and

6.      For a judgment in favor of Plaintiff and against Garcia and KS for punitive and exemplary damages in an amount to be determined at trial based upon an appropriate multiplier as determined by this Court.

RESPECTFULLY submitted this 1st day of November, 2006.

RAY QUINNEY & NEBEKER P.C.

/s/ Steven T. Waterman
Annette W. Jarvis (1649)
Steven T. Waterman (4164)
and
John F. Young
Steven R. Rider
BLOCK MARKUS & WILLIAMS LLC

Attorneys for James T. Markus, Trustee

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 1st day of November, 2006, a true and correct copy of the

foregoing **Second Amended Complaint** was served by ECF or United States Mail, first class

postage prepaid, to the following:

Stephen E. Garcia
Stephen E. Garcia PC
53 West Jackson Blvd., Suite 1660
Chicago, Illinois 60604

Carl A. Eklund
Ballard Spahr Andrews & Intersoll
1225 17th Street, Suite 2300
Denver, CO 80202-5596

J. Thomas Beckett
Parsons Behle & Latimer
201 South Main Street, Suite 1800
Salt Lake City, UT  84111


/s/ Steven T. Waterman

891136